1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    UNITED STATES OF AMERICA,          :
                                        :  07-MJ-116 (RML)
5              v.                       :
                                        :  February 26, 2007
6    MARIE C. HAWKINS,                  :  Brooklyn, New York
                                        :
7                   Defendant.          :
                                        :
8    ------------------------------------X

9
            TRANSCRIPT OF CIVIL CAUSE FOR HEARING
10          BEFORE THE HONORABLE ROBERT M. LEVY
              UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

     For the Government:
14                          UNITED STATES ATTORNEY
                            BY:  LEE JACOBS, ESQ.
15                               CARLA CHUNG, ESQ.
                                 MEGAN TOWERS, ESQ.
16                          ASSISTANT U.S. ATTORNEYS

17   For the Defendant:     ERIK PAULSEN, ESQ.
                            PERCY ROSS, ESQ.
18                          TY HINNANT, ESQ.
                            DAVID J. KLEM, ESQ.
19                          Washington Square Legal Services
                            NYU School of Law
20                          245 Sullivan Street, 5th Floor
                            New York, New York 10012
21

22   Court Transcriber:     KATHLEEN M. PRICE
                            TypeWrite Word Processing Service
23                          211 N. Milton Road
                            Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1  (Proceedings began at 11:36 a.m.)

2          THE CLERK:  Can I start with your appearances,

3  starting with the Government.

4          MR. JACOBS:  Good morning, Your Honor.  My name is

5  Lee Jacobs; I represent the Government.  And my co-counsel is

6  Carla Chung -- Ms. Carla Chung and Megan Towers.

7          THE COURT:  Morning.

8          MS. MAYER:  Deborah Mayer for the United States.

9          THE COURT:  Good morning.

10         MS. MAYER:  Good morning.

11         MR. PAULSEN:  My name is Erik Paulsen.  I'm

12  representing Marie Hawkins.  I'm here with co-counsel, Percy

13  Ross and Ty Hinnant (ph) well as our supervisor, David Klem.

14         MR. KLEM:  Good morning, Your Honor.

15         THE COURT:  Who needs no introduction, as Ms. Mayer

16  doesn't either.  Okay.  So how would you like to proceed?

17  Maybe I should hear from the Government first.

18         MS. MAYER:  Sure, Judge.  Do you want us to step up

19  or --

20         THE COURT:  Whatever is more comfortable.  There's a

21  lectern there.  If you feel comfortable at the lectern, you can

22  --

23         MS. MAYER:  I'm happy to step up.  I usually do so I

24  feel a little uncomfortable here.

25         THE COURT:  Yeah, you're all too far away from me.

1          Before each person speaks, if you could just identify

2   yourself for the record and who you're speaking for, that will

3   help the stenographer.

4          MR. JACOBS:  Sure.  Lee Jacobs for the Government.

5          THE COURT:  Yes.

6          MR. JACOBS:  Your Honor, as you are aware from the

7   letter we sent to your chambers, I believe it was last month,

8   the Government has charged Marie Hawkins with three separate

9   offenses which occurred at the Veterans Administration Hospital

10  in Bay Ridge; that she was -- simple assault, disorderly

11  conduct, and resisting arrest.

12         MR. PAULSEN:  Eric Paulsen, Your Honor.

13         We have a variety of issues we'd like to go over with

14  you.

15         THE COURT:  Okay.

16         MR. PAULSEN:  The first one, we have -- we filed a

17  fairly detailed discovery letter with the Government.  We heard

18  from them orally today that the letter should be coming through

19  today or tomorrow.  One of the significant issues that we

20  covered in the discovery letter was a potential Youngblood

21  motion.

22         The incidents that the Government described happened

23  in Veterans Hospital waiting room.  It had been videotaped at

24  the time; the videotape has since disappeared.  A lot of our --

25  our discovery letter asks specific questions covering the

4

1  specifics of that disappearance.  Depending on what we hear in

2  the discovery letter, we think we may -- would like to request

3  a <u>Youngblood</u> motion to discuss possible -- the possible I guess

4  repercussions of that loss.

5          MR. JACOBS:  May I respond to that, Your Honor?

6          THE COURT:  Yes.

7          MR. JACOBS:  Your Honor, as will be included in the

8  letter which will be sent out this afternoon, through further

9  investigation at the hospital, there was no videotape as this

10  incident occurred back in a patient screening room.  There was

11  no cameras in this area of the hospital.  There were only two

12  cameras in the emergency room at both the entrances and exits

13  to the emergency room and not in the back area in the triage

14  room where the incident occurred, and therefore, the Government

15  at this time feels that there is no <u>Youngblood</u> issue because

16  the videotape never existed in the first place.

17          MR. PAULSEN:  Your Honor, I suppose we'd like to see

18  the letter before we respond further.  Our understanding is

19  that the incident happened both in the waiting room and in the

20  side screening room from -- our prior understanding was that

21  there are cameras all over the waiting room.  So we are

22  surprised to hear that.  So --

23          THE COURT:  When you all refer to the incident, what

24  is the incident because it sounds as though there was more than

25  one thing that happened and where -- subpart where does it take

5

1   place?

2        MR. JACOBS:  Sure, Your Honor.  It is our

3   understanding at this time, what occurred was Ms. Hawkins, the

4   defendant was in the waiting room of the emergency room and she

5   was waiting to be seen, and while she was waiting another

6   patient had come into the -- was called by the triage nurse to

7   go to a back room and Ms. Hawkins followed them to a back room,

8   to the triage room and that's where the incident occurred where

9   -- of the simple assault and disorderly conduct.  And then

10  the police officers of the Veterans Administration were called

11  to respond to the scene, Ms. Hawkins resisted arrested, and

12  this all occurred in the triage area, right outside the triage

13  area which was away from the waiting room.

14       THE COURT:  And where the cameras located --

15       MR. JACOBS:  The cameras were located as far as our

16  understanding, Your Honor, at the entrances and exits to the

17  emergency room which was down the hallway and away from the

18  waiting room, and they viewed outside -- the cameras are still

19  there today.  You can look at them; they're up on the ceilings

20  and they pointed on the outsides, to view the entrances and

21  exits of the emergency room.  There were no cameras inside the

22  emergency room as they were patient areas, as patient screening

23  areas.

24       THE COURT:  So are you saying that the cameras did

25  not cover any part of the interior of the waiting room?

6

1           MR. JACOBS:  Yes, as far as we -- yes.  Yes, Your

2    Honor.

3           THE COURT:  Is that a confidentiality issue or is

4    that just a priority of screening and security issue?

5           MR. JACOBS:  As far as from our understanding through

6    our investigation with the VA, it's just their policy not to

7    have them inside of the screening area and the waiting room.

8    And I would assume, Your Honor, but I don't want to speak for

9    the Veterans Administration but a confidentiality issue.

10          THE COURT:  Have you been to the emergency -- or the

11   waiting area?

12          MR. JACOBS:  Yes, we have, Your Honor; however, I

13   should note that the ER, the emergency room area since the time

14   of this incident, since it occurred in January of 2006 has been

15   reconstructed and the ER does not exist in the way, shape and

16   form that it did previously.  However, we do have -- however,

17   the cameras are still in the same place.  They still exist in

18   the same areas and they still point outside from the same

19   entrances and exits from -- that were preexisting to when the

20   ER at the time of the incident.

21          THE COURT:  Uh-huh.  Were you able to ascertain what

22   the ER looked like before there were renovations?

23          MR. JACOBS:  Yes, Your Honor.

24          THE COURT:  How were you able to do that?

25          MR. JACOBS:  Through a schematic that we received

7

1  from the Veterans Administration.  And, furthermore, the actual

2  room -- the triage room where this incident took place still

3  exists in the same way, shape or form.  The same room, the same

4  door, just the walls have been changed.

5          THE COURT:  Okay.  And are you prepared to show the

6  schematic with the defense if that's necessary?

7          MR. JACOBS:  Yes, absolutely.

8          THE COURT:  Okay.

9          MR. PAULSEN:  Your Honor, we are somewhat surprised

10  to hear some of this.  We -- during our negotiations with the

11  prosecutors in the -- I guess the months of early fall, they

12  had told us that there was a videotape and later on they told

13  us that the videotape had either disappeared or it wasn't

14  there.  I guess we're somewhat curious to hear why they had

15  said that in the first place.  The probable cause statements

16  mention that these incidents happened in the main waiting room.

17  It doesn't say a triage room on the side.  That's --

18          THE COURT:  Who wrote the probable cause statement?

19          MR. PAULSEN:  This would have been the officers at

20  the scene, Officer Rodriguez.

21          THE COURT:  So you probably have some fodder for

22  cross-examination.

23          MR. PAULSEN:  I imagine so.

24          MR. JACOBS:  If I can respond to just the issues

25  about the cameras, Your Honor.

8

1          THE COURT:  Yes.

2          MR. JACOBS:  There was a delay in our actual onsite

3     investigation as we were -- there was going to be a disposition

4     outside of the Court which we all believed we were going to

5     come to, and the information which we did receive about the

6     videotapes and the video cameras, we had later found out it was

7     incorrect and when we made an onsite investigation, we did find

8     out the correct materials about the cameras and that's included

9     in our discovery letter.

10          MR. PAULSEN:  Your Honor, I suppose we'd still --

11    like I said, we'd like to look at the letter but I still think

12    this might cut toward a Youngblood hearing.  What we're hearing

13    right now is that we were told initially there was a videotape.

14    Now we're told that there was not a videotape.  I think we'd

15    like to explore the circumstances.  It's our understanding is

16    that the VA Hospital is somewhat fastidious on the videotaping

17    everything that goes on there.  And so it just -- it seems

18    suspicious to us that in a circumstance where perhaps a

19    videotape was lost, you know, we're hearing that there never

20    was a videotape in the first place especially after we were

21    told specifically that there was one.  I think this is

22    something that might warrant a hearing, depending on what we

23    see in the discovery letter.

24          MR. JACOBS:  Your Honor, we're not making the

25    representation that there ever -- I'll be happy to get

9

1    documents and such that we can turn over to the defense that

2    there was no videotape at all because of where the positioning

3    of the cameras -- and again I don't want to speak for the

4    Veterans Administration Hospital but maybe the policy and such

5    that there wouldn't be any inside of the triage area and that

6    we'll be glad to hand that over to the defense included with

7    our discovery letter that -- which will be going out this

8    afternoon or now tomorrow morning.

9           THE COURT:  Right.  So in other words, you understand

10   what the defense's --

11          MR. JACOBS:  Yes, absolutely.

12          THE COURT:  -- concerns are and whatever documentary

13   evidence you can provide to assuage those concerns you'll do.

14          MR. JACOBS:  Absolutely, without a doubt, Your Honor.

15          MR. PAULSEN:  I suppose we'd just like to confirm

16   that we will be receiving that information shortly.

17          MR. JACOBS:  To -- again, we will -- either this

18   afternoon or tomorrow morning to the best of what we can turn

19   over.

20          MR. PAULSEN:  Including the sketch of the waiting

21   room.  As he did mention, some of the confusion here is not

22   only -- you know, obviously as the defense -- the prosecution

23   had just said, the status of the tape has been somewhat unclear

24   but the waiting room itself was torn down, and so it's been

25   difficult to ascertain what exactly went down.  So any help

1   would be appreciated.

2          MR. JACOBS:  And we just need some time to -- if --

3   time to speak with -- to get the policy and such -- the written

4   policy and such and we'll be happy to provide that over, just

5   for the time to get that.

6          THE COURT:  Sure.  Would it be helpful if counsel

7   spoke to each other over the phone after you receive the

8   information that's going to be provided?

9          MR. JACOBS:  Sure.

10          MR. PAULSEN:  Sure.  We have been in communication --

11          MR. JACOBS:  Yes.

12          MR. PAULSEN:  -- pretty steadily.

13          THE COURT:  Oh, okay.

14          MR. PAULSEN:  So that hasn't been a problem so far.

15          THE COURT:  Okay.  So you don't need to schedule a

16   telephone conference then.

17          MR. JACOBS:  No, no, that's no problem.

18          MR. PAULSEN:  We e-mail each other quite frequently

19   so --

20          MR. JACOBS:  I think once a day at this point.

21          THE COURT:  Okay.  What else?

22          MR. PAULSEN:  We have a variety of issues.  The next

23   issue is the 3500 material.  It's been the practice between

24   these two respective clinics to exchange 3500 material about

25   two weeks before trial.  It's our understanding that the

1  Government was going to abide by that kind of continuing

2  agreement.  We just wanted to verify that.

3          MR. JACOBS:  Your Honor, we have had our clinic

4  supervisor, our professor had -- there's been a change in our

5  professorship.  We're just going to check with our professor to

6  make sure it's two weeks.  It's our understanding that it's one

7  week but if it is in fact two weeks we will definitely comply

8  with the two-week practice that is customary between the

9  clinics but that again will be included in our discover letter.

10  Whatever the practice is, the Government will comply.

11          MR. PAULSEN:  That would be the discovery letter that

12  we expect to receive --

13          MR. JACOBS:  Yes.

14          MR. PAULSEN:  -- today or tomorrow.  Sure.

15          The next issue was there's a variety of medical

16  records that might come into play in this case.  They involve

17  our client's stay at the VA Hospital during the incident in

18  question. We were going to ask the prosecution if they would

19  stipulate to her medical records so -- to obviate the need to

20  bring some sort of record custodian from the VA Hospital.  We

21  understand -- we don't want to tie up anymore VA personnel than

22  necessary and we wanted to explore whether that was possible.

23  Otherwise, I feel like we would have to just call somebody in

24  the records room there which would both lengthen the trial and

25  no doubt burden the Veterans Hospital.

1          MR. JACOBS:  Your Honor, we would just ask that if it

2    would be the complete medical record that the defense counsel

3    is referring to that we can't make a stipulation as to not

4    knowing what aspects of medical record they're referring to,

5    and if they're -- once it's opening the medical records, then

6    the entirety of the medical records should be opened.

7          MR. PAULSEN:  We haven't received official copies of

8    the records yet.  So I guess we'll discuss that with you.  As

9    far as complete, are you referring to complete for her stay or

10   are you -- you're not referring to her entire medical history?

11         MR. JACOBS:  Oh, no, relating to the stay of the

12   incident and the reasoning as to why she was -- excuse me, Your

13   Honor.  Excuse me.

14       (Counsel confer.)

15         MR. JACOBS:  Your Honor, we believe that one of the

16   defenses the defense may raise may be justification, that she

17   was at the ER at the time and was seeking medical attention,

18   that we would need a complete medical record to see if she had

19   suffered this condition at a previous time.

20         THE COURT:  Complete meaning past --

21         MR. JACOBS:  Yes, Your Honor.

22         THE COURT:  -- past history.

23         MR. PAULSEN:  Okay.  I'm not sure we have a specific

24   response to that right now.

25         MR. JACOBS:  We can -- again, we can discuss this out

13

1   --

2           MR. PAULSEN:  Okay.

3           THE COURT:  Again, my experience it's fairly typical

4   for the parties to stipulate as to any and all records.  If

5   there's any part that you think ought to be excluded, then

6   that's something that you can either bring before the Court or

7   agree to.

8           MR. JACOBS:  Okay.

9           MR. PAULSEN:  Thank you, Your Honor.

10          THE COURT:  If that makes it easier.

11          MR. PAULSEN:  We have a variety of issues regarding

12  the three charges that are in play.

13          THE COURT:  Okay.

14          MR. PAULSEN:  My co-counsel Percy Ross is going to

15  discuss two of them and I'm going to discuss the third.

16          MR. ROSS:  So we have three charges, Your Honor, the

17  disorderly conduct, the resisting arrest, and the simple

18  assault charge.  I'll address the simple assault charge first

19  because it was originally charged as 18 U.S.C. 113(e).

20  However, that no longer exists.  We actually believe that the

21  proper charge is 18 U.S.C. 113(a)(5) which is simple assault.

22  This statute has recently been amended.

23          We brought this up in our discovery letter on the

24  26th -- September 26th so it has been brought to the

25  Government's attention.

14

1          THE COURT:  Are there any implications as to proof or

2   other consequences?

3          MR. ROSS:  We don't believe so, no.

4          THE COURT:  Okay.

5          MR. PAULSEN:  Your Honor, the statutes were just

6   reorganized and somewhat -- I think the officer was used to

7   deal with the previous way it was organized.  It's the same

8   charge.  The student prosecutor has acknowledged the mistake

9   and I think they had said that they were going to fix it.  It

10  just hasn't been fix it; it just hasn't been fixed it and we

11  just wanted to make sure at some point it got taken care of.

12         THE COURT:  So this is just a housekeeping matter,

13  Mr. Ross?

14         MR. ROSS:  Yes.  It's housecleaning, yes.  And we

15  would accept an oral modification to the charge if the student

16  prosecutors would like to do it in that way.

17         MR. JACOBS:  Your Honor, as for oral purposes, that's

18  fine but just for notice purposes on the actual violation

19  notice, it does state in the offense description simple assault

20  18 U.S.A. (a)(5) [sic] beneath the actual description of the

21  offense but in the actual offense charge box, it has the old --

22  the pre-reorganized statute.

23         THE COURT:  You're not claiming lack of notice.

24         MR. ROSS:  No, that's actually not true.

25         MR. JACOBS:  Sorry, I take that back.  I take that

1  back.  Theirs doesn't --

2       MR. PAULSEN:  We're not claiming lack of notice.  All

3  we're -- it's a housekeeping measure.  We're just noting for

4  the record that the proper citation for the charge is 18 U.S.C.

5  113(a)(5) and we ask that the -- to the extent that there's a

6  record on it that it be amended to so show that citation

7  instead of the one that was originally by the police officer on

8  the probable cause statement.  We're making no other claims

9  regarding that.

10      MR. JACOBS:  That's fine.

11      MR. ROSS:  Also, Your Honor, under the disorderly

12  conduct charge, Ms. Hawkins has been charged with 38 CFR

13  1.218(b)(11).  However, that's the penalty section of the

14  disorderly conduct charge and we also believe that she needs to

15  be charged with the substance -- substantive offense which is

16  in this case 1.218 (1)(5), and we're raising this issue now

17  because we believe that there might be a multiplicity issue in

18  the actual violation notice in terms of under (a)(5) which

19  creates a range of issues that can constitute disorderly

20  conduct.

21      According to the violation notice, she actually

22  qualifies under a number of these different elements and we had

23  said in our original bill of particulars that we would like to

24  know exactly what part of the charge she was being charged

25  with.  The Government initially responded that the such

16

1   information is not necessary to apprise the defendant of the

2   charges against him -- him or her.  We actually believe it's

3   quite important to know exactly what she's being charged under,

4   both because of the multiplicity issue and because if -- the

5   portion of the disorderly conduct charge relates to loud and

6   boisterous noise, there might be an as applied First Amendment

7   constitutional issue that we want to raise.

8            So I guess we're just saying we'd like to know in

9   discovery exactly what element of the charge.

10           MR. JACOBS:  Our discovery letter will clarify which

11   punitive -- which substantive aspect of this statute she's

12   being charged under.  We had thought it was clear but we'll

13   clarify that, Your Honor.

14           MR. ROSS:  Just to be clear about the defense's

15   position, the regulation at issue provides a number of ways in

16   which an individual can be disorderly at the Veterans Affairs

17   Hospital.  We're seeking to narrow down which one of those the

18   prosecution is going by.  To the extent they're going by

19   multiple such grounds, we believe that would be inappropriate

20   given the single violation notice that has been issued to Ms.

21   Hawkins at this point.  And so we'll wait the discovery letter.

22           THE COURT:  And the First Amendment issue has to do

23   with her language?

24           MR. ROSS:  With just one of those --

25           THE COURT:  Right.  With the loud and boisterous --

1      MR. ROSS:  -- ways of doing it, a loud and boisterous

2  noise which traditionally the Government hasn't pursued in

3  other cases.

4      THE COURT:  Right.

5      MR. ROSS:  I would guess with the recognition that

6  there certainly could be First Amendment issues with that and

7  we just want to ensure that that is the Government's theory

8  here.  If it is, we will then be filing a motion with the --

9      THE COURT:  Wasn't there a state -- there was a State

10  Constitutional decision years ago, I think involving the

11  harassment statute where it was -- I think someone was called a

12  "retard" or something like that, and it was -- the harassment

13  statute was deemed -- was found unconstitutional I think as

14  applied when used with some kind of derogatory epithet if

15  that's -- you're bringing back when I was a lawyer.  So I'm

16  just trying to remember what that was.

17      MR. ROSS:  That would be essential to our argument if

18  the Government were pursuing a disorderly conduct --

19      THE COURT:  Right.

20      MR. ROSS:  -- conviction under that section.

21      THE COURT:  What I don't know is whether the Federal

22  Constitution has ever been --

23      MS. MAYER:  Judge -- I mean, Mr. Jacobs said, you

24  know, this will be clarified since the actual substantive

25  statute, only the punitive statute was included on the

18

 1   violation, the penalty portion.  He'll clarify which --

 2          THE COURT:  Okay.

 3          MS. MAYER:  -- of these substantive.  However, as far

 4   as I think what Mr. Jacobs wanted to make clear was that the

 5   defense has in its possession a factual statement of what

 6   happened and what the actual conduct was.  So that's why in the

 7   letter when they responded that a bill of particulars was not

 8   necessary because the defense is actually in possession of a

 9   very detailed factual statement of what the defendant's alleged

10   conduct was.

11          THE COURT:  So there's notice as to conduct and all

12   they need to know is --

13          MS. MAYER:  Right --

14          THE COURT:  -- which specific --

15          MS. MAYER:  -- which is the statute -- which was an

16   oversight on our part.

17          THE COURT:  Okay.  Sounds good to me.

18          MR. PAULSEN:  All right.  Your Honor, we have one

19   final issue.  It's with the third charge, the resisting arrest

20   charge.  This is going to be probably the most complicated

21   request we're going to make.  It is -- the resisting arrest is

22   a Class A misdemeanor which means it's improperly brought as a

23   violation.

24          The Government has been on notice on this for, you

25   know -- from the beginning but we had -- I guess it expended

1   our energy in a lot of negotiations.  So it was never

2   officially amended.  We did have some discussions with the

3   Government about amending it down to a B which is often the

4   current practice if we -- if the client does not insist on a

5   jury trial on the A misdemeanor which is the client's right.

6           After discussing the issue with our clients, with our

7   supervisor, and with my colleagues, we've decided that we would

8   like to request a jury trial on the resisting arrest charge.

9   So we are I guess somewhat saying we do not wish them to

10  downgrade it -- downgrade the charge, and we would like to

11  discuss with Your Honor what the implications of that would be

12  for the rest of this proceeding.

13          MR. JACOBS:  Your Honor, it is the Government's

14  position that we -- it is our right to choose what we can --

15  what charges we can bring forth against the defendant, and we

16  are seeking to -- based on -- not only on previous discussion

17  with the defense to downgrade this charge and we would

18  downgrade it to a Class B misdemeanor specifically to -- we

19  would downgrade the resisting arrest to a Class B misdemeanor,

20  Your Honor.

21          MR. PAULSEN:  Your Honor, if I may?  We did have two

22  brief discussions with the Government over this issue.  We

23  certainly don't deny that.  It was -- no action had ever

24  actually been taken.  It's our -- you know, our intent that

25  should they downgrade the charge, we will file an ACA motion,

20

1   Assimilated Crimes Act motion that this charge replicates a

2   charge that's already in Federal law.  There is a District of

3   Colorado decision in the Federal Court from about seven years

4   ago which states explicitly that resisting arrest is in the

5   Federal statutes, a state resisting arrest charge which

6   essentially duplicates.  That Federal charge cannot be brought

7   through the Assimilated Crimes Act, and just the general

8   standard of a <u>Lewis v. U.S.</u> which is the 1998 Supreme Court

9   case that governs ACA motions I think is quite clear that

10  should we file an ACA motion that we'll succeed.

11          So we will resist the downgrading.

12          THE COURT:  Well, if you win the motion, what's the

13  implication then?

14          MR. PAULSEN:  The implication is our client would --

15  a jury trial on this particular charge.

16          THE COURT:  Can there be a jury trial on a B?  Is it

17  discretionary or --

18          MR. JACOBS:  No --

19          THE COURT:  Impossible.  It can't be done, right?

20          MR. JACOBS:  We don't believe so, Your Honor.

21          THE COURT:  Okay.

22          MR. JACOBS:  Your Honor, I just wanted to clarify.  I

23  may have mischaracterized my statements earlier about the Class

24  B.  We are still in further consultation with my supervisor and

25  with our clinic office about whether or not to downgrade this

1   motion.  We were going to -- I received notice that they still

2   wanted to go for -- notice that they wanted to go forth with a

3   jury trial on Saturday.  We're still in consultation with one

4   another and with our office and we will -- whether or not the

5   decision to downgrade or not hasn't been fully made yet and we

6   will be in consultation with the defense counsel on this

7   matter.  This may be resolved outside as well, Your Honor.

8           MR. PAULSEN:  We have just a few kind of housekeeping

9   issues, just to make sure that we understand where we're going

10   with this.  It's -- and I'm going to let my colleague, Percy

11   take care of these.

12           MR. ROSS:  Yes, Your Honor.  We know the trial is set

13   for Friday, April 13th and we --

14           THE COURT:  Are you worried about that?

15           MR. ROSS:  Well, we're trying to put aside our

16   anxiety for the moment.  We just wanted to clarify if that

17   trial would be beginning at be 9:30 or ten o'clock.  What is

18   the common --

19           THE COURT:  It would begin at 9:30.

20           MR. ROSS:  Okay.

21           THE COURT:  However, if there is a jury trial, we'll

22   have to revise the dates.

23           MR. ROSS:  Okay.  We were also curious as to the

24   expected length of the trial.

25           THE COURT:  So am I.

1        MR. JACOBS:  We sent in a letter to -- one of the e-

2    mails that we sent was the list of all possible witnesses which

3    we could be calling but at the current time, about --

4    approximately one day, Your Honor.  We feel it shouldn't take

5    more than one day.

6        THE COURT:  Is that one day for your presentation or

7    --

8        MR. JACOBS:  I'm assuming one day everybody.  I'm

9    hoping one day everybody.

10       THE COURT:  How many witnesses do you have?

11       MR. JACOBS:  Five or six, Your Honor.  They would be

12   very short examinations.  They will be --

13       THE COURT:  Short direct.

14       MR. JACOBS:  Yes, short directs, yes.

15       MR. ROSS:  We did receive an e-mail from the student

16   prosecutors.  It was a list of people who may have witnessed

17   the incident.  We were not necessarily aware that they would be

18   their witness list per se.

19       MR. JACOBS:  It'S not our witness list, per se but

20   it's a list of people who had observed the incident but at this

21   time, it would be five or six that could lessen obviously or --

22       MR. ROSS: Right.  I think our understanding is the

23   list you gave us was not much more than five or six people --

24       MR. JACOBS:  Right.

25       MR. ROSS:  -- so unless you're talking about a

23

1   different set of people, that sounds like your witness list.

2           THE COURT:  All right.  Jury selections in this Court

3   are usually on Mondays.   The next juror return date -- we do

4   them on alternate weeks.  The next juror return date is April

5   16th.  So hold that date just in case.

6           MR. ROSS:  And -- I'm sorry, Your Honor, did I

7   interrupt you?  Oh.  Just finally, in terms of courtroom setup,

8   we wanted to clarify that we would not need any audiovisual

9   equipment but we would appreciate it if we could have an easel

10  or two for our visual aids.

11          THE COURT:  I think we can manage that.

12          MR. ROSS:  Great.  Great.  And really that's all the

13  issues we had to raise today.  So --

14          MR. JACOBS:  Your Honor, we have one housekeeping

15  motion just for a motion schedule, that based upon the dates

16  that we spoke about earlier of our availability with class and

17  such that if defense agrees if we came up with a motion

18  schedule if this works for you all, any motions would be the

19  12th -- that for you all to make to be the 12th of April --

20  12th of March, excuse me.  We would reply to those motions by

21  the 26th and then you would have a chance to reply to our --

22  your reply by the 2nd of April.  If that works for Your Honor

23  and the defense, if that's a good calendar.

24          MR. ROSS:  What was the reply date for -- 12th of

25  March to be filed --

 1          MR. JACOBS:  It would be the 12th of March to be

 2   filed, the 26th for the reply -- response, excuse me, and the

 3   2nd for the sur.

 4          MR. ROSS:  Your Honor, we have to coordinate a number

 5   of people's schedules.  If you wouldn't mind, if we could get

 6   back to the student prosecutors on that.  Perhaps agree

 7   tentatively.

 8          MR. PAULSEN:  We could agree to that as a tentative

 9   date.  It all obviously depends on what the prosecution is

10   informing us about the issues that we brought up today.  So

11   far, we don't anticipate any motions aside from the Youngblood

12   --

13          THE COURT:  Okay.

14          MR. PAULSEN:  -- that we've discussed but that's

15   going to depend --

16          MR. JACOBS:  On what else you see.

17          MR. PAULSEN:  -- on the Assimilated Crimes Act and

18   everything else --

19          MR. JACOBS:  Absolutely.

20          MR. PAULSEN:  -- and when you provide us with

21   information.

22          MS. MAYER:  We can always push it by a couple of

23   days, Judge.  I just -- when we sat down to look at the

24   schedules, we were trying to give both parties the same amount

25   of time.  So we picked two weeks out from today for affirmative

25

1  motions including the Government's for a (4)(b) motion and a

2  (b)(1), two weeks for the opposing parties to respond, and the

3  one week for a reply -- and still leaving the Court enough time

4  to look at the motions and have any decisions so as to enable

5  them to prepare their case in light of the Court's ruling.

6          THE COURT:  If there's going to be a jury trial,

7  proposed voir dire and proposed request to charge would be due

8  -- I have April 2nd because I would want that about two weeks

9  before as well.  Proposed voir dire doesn't have to be very,

10  very lengthy because as the supervisors know, the judges do

11  most of the questioning.  So if there's only -- if there's

12  something specific to this case that you want to ask.

13          MR. JACOBS:  Yes, Your Honor.  I believe we have

14  nothing else.

15          MR. PAULSEN:  I think we've exhausted our issues as

16  well.  One final issue actually regarding 3500 material and the

17  exchange of information.  As it's -- at this point undecided

18  whether it will be a bench trial or a jury trial, to the extent

19  that we cannot CC Your Honor on unnecessary exchanges of

20  communications between the parties until and unless it's

21  determined that it's a jury trial and you can get all the

22  unnecessary CC's that you'd like.  If that's agreeable with

23  everyone.

24          MS. MAYER:  That's -- no problem.  I don't think --

25  have you been CC'ing the Court on anything?

1          MR. JACOBS:  No.  No.

2          THE COURT:  I guarantee you I haven't read anything.

3   Okay.

4          MR. JACOBS:  Thank you, Your Honor.

5          MR. PAULSEN:  Wonderful.  Thank you, Your Honor.

6          MR. ROSS:  Thank you, Your Honor.

7          THE COURT:  So on this jury issue, am I okay to hear

8   about this -- I think I would like a date when I hear about it

9   because I don't want to just hear about it just as a motion.

10          MS. MAYER:  Judge, what -- I will consult with the

11  student prosecutors and Carolyn Pokorny who is the instructor

12  for their class on the issue of the resisting arrest which is

13  currently the Class A misdemeanor and we will have something to

14  the defendant, you know, the end of this week in writing to the

15  defendant detailing if there is going to be an amendment in

16  terms of violation and, you know, asserting what the basis is,

17  if they're -- you know, if we believe we're obligated to lay

18  out any legal basis or whether or not it's just a proper

19  exercise of prosecutorial discretion and then if the defendant

20  needs an extra week to give them two full weeks to brief that

21  issue in light -- we certainly have no objection to giving them

22  two full weeks from when we filed but we will do something

23  before the end of this week.

24          MR. PAULSEN:  Just so the defendant's position is

25  clear again, to the extent there is an A misdemeanor in the

27

1  case and to the extent that Ms. Hawkins has a right to a jury

2  trial, she will be asserting that right to a jury trial and --

3          MS. MAYER:  I'm just not as familiar -- I mean,

4  obviously when I deal with Federal felonies, it's the

5  Government's right to move to dismiss a count of an indictment

6  and regardless of whether or not the defense believes that they

7  want to insist on that charge I'm just not as familiar with

8  this area which is why I'm going to consult with Ms. Pokorny as

9  well because this is her area of expertise as the instructor

10  for the class and --

11          MR. PAULSEN:  Yes.  We also don't dispute the

12  Government if they choose to dismiss the resisting arrest and

13  proceed on the two B misdemeanors we don't dispute that.  We

14  also would accept an oral amendment of the charge without the

15  need of a new probable cause statement.  I believe the probable

16  cause statement is sufficient.  If they're planning on amending

17  the charge, the only thing we would do is reserve our right to

18  assert an Assimilated Crimes Act violation for that amendment.

19          MS. MAYER:  And it sounds like we may be able to

20  certainly speed this along so that we will -- there will be an

21  easier time of getting any issues to the Court more quickly.

22  It sounds like we can certainly work on that.

23          THE COURT:  It would help me to have a status report

24  by a date certain so that I can be sure that I've scheduled the

25  right date for the trial.

28

1          MR. JACOBS:  Yes, Your Honor.

2      (Counsel confer.)

3          MS. MAYER:  So by Monday we can tell the Court,

4  that's fine with us, Judge.  So by next Monday we can at least

5  tell the Court the status of whether or not there's going to be

6  an issue under ACA.

7          THE COURT:  Okay.  So March 5th then.  And if that's

8  the case -- I know Fridays are better for all of you, right?

9          MR. JACOBS:  I think Mondays were better --

10          THE COURT:  Oh, Mondays are better?

11      (Counsel confer.)

12          MR. PAULSEN:  I think Mondays after 11 work for us.

13          MR. JACOBS:  Mondays or Fridays for us.

14          MR. PAULSEN:  Fridays are fine as well.

15          MR. JACOBS:  Yeah, Fridays are the best date I

16  believe.

17          MR. PAULSEN:  Fridays work for me.

18          THE COURT:  Well, we would -- if we have a jury

19  trial, I would start it at 9:30, put the jury selection on the

20  16th.

21          MR. PAULSEN:  Okay.

22          MR. JACOBS:  Okay.

23          THE COURT:  So that just changed the trial date from

24  -- I would prefer to keep it as the 13th right now and hold the

25  16th in reserve.  That way, if the trial goes over which I

29

1   don't think it will --

2          MR. PAULSEN:  I think we would agree with that as

3   well.  At least while we're taking this week to determine the

4   status of the resisting arrest.

5          THE COURT:  Otherwise, if it looks as though you're

6   going to brief this and there might be a jury issue, the trial

7   would be on the 16th.  It can only up until 3:30 on the 16th

8   because I have to teach on the 16th.  And then it would

9   continue on the 17th.

10          MR. PAULSEN:  Terrific.

11          THE COURT:  Okay?

12          MR. JACOBS:  Thank you, Your Honor.

13          MR. PAULSEN:  Thank you, Your Honor.

14   (Proceedings concluded at 12:08 p.m.)

15                          *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

30

1    I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                              Kathleen M. Price
                    _____

6                              Kathleen M. Price

7

8  Dated:  February 29, 2016

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25